**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 23-CR-105 (JEB)** |
| | ) | |
| **KENDRID HAMLIN,** | ) | |
| | ) | |
| **Defendant** | ) | |
| _____ | ) | |

**<u>DEFENSE SENTENCING MEMORANDUM</u>**

*For, brother, men*
*Can Counsel and speak comfort to that grief,*
*Which they themselves not feel, but tasting it,*
*Their Counsel turns to passion, which before,*
*Would give preceptial medicine to rage,*
*Fetter strong madness in a silken thread,*
*Charm ache with air, and agony with words.*

-William Shakespeare, Much Ado About Nothing, Act 5, Scene 1, lines 22-34

\*\*\*\*\*\*\*\*\*\*\*\*\*

Kendrid Khalil Hamlin, through undersigned Counsel, hereby respectfully submits this

Sentencing Memorandum in anticipation of his sentencing, currently set for November 16, 2023.  Based

on Mr. Hamlin's acceptance of responsibility and the relevant sentencing factors pursuant to 18 U.S.C. §

3553(a),  the defense respectfully submits that a sentence of one year and one day, with a term of

structured supervised release to follow, is fair and reasonable given Mr. Hamlin's documented history of

mental illness, ███████████ extensive trauma, and substance abuse issues. Counsel further

respectfully requests that this Court order participation in inpatient substance abuse treatment with

mental health treatment upon release, as outlined below.

**<u>Introduction</u>**

Mr. Hamlin is a young man whose life has been beleaguered from an early age by ███████████ severe mental illness, and addiction. *See* Ex. 1, Report and Recommendation by Dr. Katherine Robinson (under seal). ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ █████████████████████████████ he was unable to obtain sufficient therapeutic support, fell into addiction, and soon became homeless, compounding the challenges he faced in accessing consistent mental health and substance abuse treatment. When Mr. Hamlin was arrested in this case, he was off his medication, living in the streets, and struggling acutely with addiction.

Mr. Hamlin's series of afflictions have led to extended emergency stays at the ████████████ ██████████████████████████████. Each time, Mr. Hamlin entered in a high state of distress. But each time, Mr. Hamlin was medicated and providing therapeutic support, gradually improving until he stabilized.

Mr. Hamlin, with proper therapeutic support, is by all accounts a kind hearted, funny and warm young man. He is extremely remorseful for assaulting Congresswoman Craig, not because of her office, but because she was an innocent woman who meant him no harm. He went into the apartment building to get out of the cold not even expecting to see anyone. When Rep. Craig greeted him and showed him kindness, he asked to go use her bathroom, hoping he could wash up. But he did so by following her into the elevator, understandably terrifying Rep. Craig in the process. He didn't mean Rep. Craig any harm. If he had, he wouldn't have talked to her and done pushups. But his bizarre behavior was objectively terrifying and Rep. Craig had already swiped her fob and pressed the button for her floor. Mr. Hamlin did not have any intention of hitting Rep. Craig but he interpreted her fear as aggression. He very much regrets that he scuffled with her and struck her, and immediately instructed Counsel that

he wanted to plead guilty regardless of the government's offer.  He then pleaded guilty to the indictment, including to a second misdemeanor assault charge that otherwise would have been dropped.

18 U.S.C. § 351(e) does not require that the accused be aware that the complainant is in fact a member of Congress, and the Government does not allege, nor does anyone believe, that the conduct in question here was targeted. The primary contested issue is whether the physical restraint enhancement – typically used when restraint is prolonged – would apply to this brief incident.  Mr. Hamlin did not have the requisite intent: he was not intending anything in his state of mind - all of his actions were reactive. The government advocates for a harsh sentence to maximize punishment.  Rep. Craig though requests the sentence to reflect compassion and most importantly rehabilitation. Indeed, Mr. Hamlin has not had the structure to remain on medication ever since he aged out of Family Court.  Counsel presents a plan to provide Mr. Hamlin with the support and structure that he needs to remain on medication and be a positive member in society.  After a period of incarceration of one year and one day, Mr. Hamlin should be placed under a term of supervision with the following conditions:

- Placement at ██████████ Inpatient Treatment Program with a 6 month Transitional Housing Program to follow;

- Connection to █████ ACT Team, a D.C. Office of Behavioral Health Core Service Agency, for ongoing psychiatric care while in inpatient treatment, as well as assistance in applying for economic supports such as SSDI;

- Referral to the Department of Disability Services for one-on-one aide services and future supportive housing;

- Referral for housing voucher for long-term housing post-treatment;

- Refrain from "any use of a narcotic drug or other controlled substance . . . without a prescription," *id.* § 3142(c)(1)(B)(ix).

## I.      The Guidelines Calculation

The proper guideline range for Mr. Hamlin is 15 to 21 months. He is in Criminal History Category VI (although Counsel believes the conviction noted at line 42 in the PSR should only be assessed as 1

point, making his total criminal history score a 16). Counsel objects to the "restraint" enhancement based on the application of the law to the facts, as detailed below. As such, Mr. Hamlin's adjusted offense level after acceptance of responsibility is 7 (base level offense of 7, +2 upward enhancement for bodily injury, -2 for acceptance of responsibility). The two misdemeanor assault on a police officer counts are misdemeanors under the D.C. Code and are not subject to the U.S. Sentencing Guidelines. The Court can impose concurrent time on these counts. In addition to the foregoing, Counsel submits that a departure or variance is warranted pursuant to U.S.S.G. §5H1.3, as detailed below.

### A. The Restraint Enhancement Does Not Apply, Even Under the Government's Version of the Facts

The government requests that this Court apply an enhancement for Restraint of Victim under U.S. Sentencing Guideline §3A1.3. Even adopting the government's version of facts, the enhancement does not apply in this case. The D.C. Circuit has found that application of the enhancement "requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *United States v. Drew¸* 200 F.3d 871, 880 (D.C. Cir. 2000). The Third Circuit has delved deepest into the issue and pronounced a five-pronged test. *United States v. Bell*, 947, F.3d 49, 55 (3d. Cir. 2020). Because any arguable restraint was fleeting in this case and because the government relies upon speculative and conclusory accounts by the complainant, the government has not met its burden by a preponderance of the evidence.

In *United States v. Drew¸* the Circuit rejected the District Court's application of the two-level physical restraint enhancement. There, the defendant had ordered the complainant to leave her bedroom and forced her to walk downstairs at gunpoint. *Drew¸* 200 F.3d at 880. The Court noted, "While [the complainant] no doubt *felt* restrained by Drew, she was 'not subject to physical restraint as we interpret the Guideline's use of that phrase.'" *Id.* (emphasis in original).

*Bell* offers a more structured analysis, summarizing the approach of the circuits more generally. The Third Circuit concluded that "five broad factors" had been used by the circuits in evaluating application of the enhancement, namely: 1) Use of physical force; 2) Exerting control over the victim; 3) Providing the victim with no alternative but compliance; 4) Focusing on the victim for some period of time; and 5) placement in a confined space. *Bell*¸ 947 F.3d at 56.

These factors conclusively demonstrate that this enhancement should not apply to Mr. Hamlin because under any interpretation of the facts, he never tried to control or confine the complainant. According to the initial report, Rep. Craig voluntarily entered the elevator on her own and Mr. Hamlin slipped in as the doors closed. Mr. Hamlin then entered into the elevator and said "I need to use your bathroom." At no point did he make any statements ordering the complainant or restraining the complainant.

*Bell* offers analysis of facts that are squarely on point here. The government pointed to the factual allegation that in a robbery, "Bell physically confronted a store employee, by grabbing the employee's neck, pointing the weapon at his neck and throwing the employee to the ground." *Id.* at 52-53. The court rejected this argument, ruling: "While grabbing the victim by the neck and forcing him to the floor satisfies the requirement that the force be physical, we cannot say that the victim was left with no alternative but compliance (a point the government never addresses) since the victim twice attempted to thwart the robbery. Further the physical restraint was quite limited in time. It could not have taken more than a few seconds for Bell to grab the victim's neck and shove him to the floor. Thus, there was no sustained focus on the victim." *Id.* at 61.

Similarly, Mr. Hamlin's physical "grab" had to have been fleeting and the restraint would have been "only seconds from start to finish." *Id.* And critically, as is *Bell*, if the Court applies "the

enhancement here, then any crime that involves a chance encounter with a victim with any physical dimension would require application of the enhancement." *Id.*

Indeed, application of the enhancement is even less justified here than in *Bell* because Mr. Hamlin's statements and behavior can most fairly be characterized as bizarre, or as Rep. Craig said to police, "clearly medicated … like he just got out of the hospital." The first thing Mr. Hamlin did when he entered the elevator was to show Rep. Craig an injury on his arm. He next dropped to the floor and performed pushups. And to the extent that Rep. Craig felt confined, it was a matter of happenstance – she had already pushed the button for her floor and then held the button. Mr. Hamlin then pushed past her, and she incidentally let the door close by releasing the button. *See* Exh. 2 (Rep. Craig statement to USAO-D.C. on February 16, 2023). The elevator went to the eighth floor because Rep. Craig removed her finger from the button – not because Mr. Hamlin pressed the close door button or the button for the eighth floor. And there is no evidence that Rep. Craig attempted to try and push buttons for other floors or that Mr. Hamlin specifically prevented her from doing so. The layout of the elevator and the buttons can be seen in this stillshot from bodyworn camera footage.



The government relies purely upon speculation in asserting: 1) "pull[ed] her back"; 2) "prevent[ed] her from accessing the elevator buttons"; and 3) "tried to pull her back into the elevator." ECF No. 39 at

6.  But there is no evidence that Mr. Hamlin was trying to confine Rep. Craig to the elevator.  To the contrary, he expressed that he came into the elevator in hopes of using her bathroom. But even if Mr. Hamlin's grab of Rep. Craig's collar area was forceful, the action still does not qualify as physical restraint because Rep. Craig did not have an alternative but to comply and because the restraint was limited in time.

The government relies upon a 1989 case from the Fourth Circuit to support applying the enhancement.  ECF No. 39 at 5 (citing *United States v. Stokley*¸881 F.2d 114, 116 (4th Cir. 1989).  But *Stokley*, unlike this case, involved a defendant who "made his intent clear by stating, 'Oh no, you don't' by standing in the door and pushing her back…." *Id.*  Also of significance, the defendant had placed a lit explosive about a foot away from the victim before making that statement demonstrating that his intent was to restrain her in order for her to be injured by the impending explosion.  Finally, the Fourth Circuit limited *Stokley* in a subsequent decision because Stokley's victim "was confined to a room for some time." *United States v. Mikalajunas*, 936 F.2d 153, 156 (4th Cir. 1991).

The government's citation to *United States v. Waugh*, 207 F.3d 1098 (8th Cir. 2000) is similarly unpersuasive.  There, the defendant assaulted a woman within a residence, culminating in a broken nose, eyes swollen shut and tendon damage to parts of her body.  *Id.* at 1100.  The episode only ended when "upon hearing screams from [the victim] the officers broke into the house and rescued her."  *Id.*  The horrific facts of *Waugh* simply bear no resemblance to this case.

The Eighth Circuit is in fact one of the jurisdictions (along with the Second, Third, Seventh and Eleventh) that defines physical restraint: "Under §2B3.1(b)(4)(B), a defendant physically restrains persons if the defendant creates circumstances allowing the persons no alternative but compliance.  *United States v. Kirtley*, 986 F.2d 285, 286 (8th Cir. 1993) (holding "because the [victims] had no alternative but to obey, Kirtley physically restrained them.").

In short, whether or not the Court decides to adopt the *Bell* factors, it should not apply the physical restraint enhancement. Although Rep. Craig could well have thought she was being restrained, Mr. Hamlin used physical force very briefly and never exerted control over Rep. Craig. There was no "sustained focus" on Rep. Craig and the whole incident took the amount of time for an elevator to ascend eight floors. Furthermore, the circumstances and even the confinement was not created by Mr. Hamlin as he neither forced Rep. Craig into the elevator nor ultimately prevented her from leaving.

**B.** **The Government's Version of the Facts is Incorrect.**

The government's version of facts in its memorandum misstates the information provided by Rep. Craig. Although the enhancement should not be applied under any set of facts, the government is incorrect about the order of events.

The government implies that the chronological order of the events were as follows: 1) Mr. Hamlin punched her; 2) Rep. Craig turned to the buttons; 3) Mr. Hamlin pulled her back with his hands; 4) Mr. Hamlin grabbed Rep. Craig's collar bone and neck and pulled her back; 5) the elevator door opened; 6) Mr. Hamlin pulled Rep. Craig back into the elevator; 7) Rep. Craig threw hot coffee on Mr. Hamlin; and 8) Mr. Hamlin finally released her. ECF No. 39 at 6.

But days after the incident Rep. Craig provided an account to the U.S. Attorney's Office and Capitol Police. According to discovery, on February 16, 2023, Rep. Craig stated that: 1) Mr. Hamlin pushed past Rep. Craig, causing her finger to release the button and the doors closed; 2) Rep. Craig pushed Mr. Hamlin; 3) Mr. Hamlin put his hands on her shoulders near her neck; 4) the elevator reached the eighth floor; 5) Rep. Craig threw coffee over her shoulder; 6) Mr. Hamlin released her; 7) Mr. Hamlin punched Rep. Craig; and 8) Rep. Craig fell out of the elevator.

In all versions, Rep. Craig said that she had entered the elevator on her own and that Mr. Hamlin slipped in before the doors closed. She also said that she had pushed the button for her floor. She

consistently reported that Mr. Hamlin said, "I need to use your bathroom" and that he began to do pushups. She also consistently reported that he became agitated when she asked him to leave the elevator.

Rep. Craig never said that Mr. Hamlin ordered her into the elevator or told her to stay in the elevator. Rep. Craig assumed that Mr. Hamlin's actions were designed on preventing her from leaving the elevator even though he asked if he could use her bathroom and even though he never pushed a button to close the doors or prevented the doors from reopening. Rep. Craig does not allege that Mr. Hamlin pulled the emergency stop button incapacitating the elevator or pushed a button to keep the doors closed. In short, Rep. Craig only reported that she felt restrained but stated no objective facts to demonstrate that Mr. Hamlin intended to restrain her. Respectfully, the restraint enhancement does not apply here.

## II.    **Sentencing Law**

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984...ma[de] the Guidelines effectively *advisory*." *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

       **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

       **(B)** to afford adequate deterrence to criminal conduct;

       **(C)** to protect the public from further crimes of the defendant; and

    **(D)** to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

    Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).  In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  *Id*. § 3553(a)(1).  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

    Congress has further provided that:

    [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. § 3553(a) (emphasis added).

    Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*,

551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable.  *Id.*  By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020) ("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

### III.    Application of the Sentencing Factors to This Case

`Due to the circumstances of the offense, Mr. Hamlin's history and characteristics, and the relevant sentencing factors, a sentence of time-served in this matter is the only sentence that is not greater than necessary, yet sufficient, for the purposes of sentencing. This sentence would permit close coordination of critical mental health and substance abuse treatment services here in the District, to include direct placement into inpatient treatment followed by transitional housing at ███████ as well as

connection to ACT Team services through the D.C. Department of Behavioral Health, thereby addressing

his homelessness, addiction issues, and mental illness.

### A.  The History and Characteristics of Mr. Hamlin

Indicia of mental illness began early for Mr. Hamlin, ███████████████████████

████████████████████████ *See generally* Ex. 1. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

In this context, Mr. Hamlin was diagnosed as a child with both learning disabilities and mental

illness, and given an Individualized Education Program (IEP) to help support him at school. The IEP reports make clear that Mr. Hamlin's mental health issues significantly impacted his ability to learn in the classroom. ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

While these IEP progress reports initially demonstrated progress, Mr. Hamlin was still not receiving the support necessary for his mental health struggles. ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Mr. Hamlin has continued to suffer trauma since living unhoused in D.C.. He has been assaulted and stabbed on multiple occasions and experienced several serious accidents, including getting hit by a car and at one point getting hit by a Metro train. His mother recounts receiving the terrifying call from the hospital with the news that he had been hit by a train, and that he was incredibly fortunate to survive.

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

Most painful to him, however, is the recent loss of his older brother, who was more like a father figure to him. Mr. Hamlin learned about his passing while incarcerated last year, and has struggled immensely since then. Mr. Hamlin has reported that though he generally takes physical pain well, he finds emotional pain "unbearable." ███████████████████████████████████

████████ he reported intense feelings of guilt and worthlessness, particularly in response to bereavement; he stated that when other people died he often wondered why God did not take his life instead, ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

Yet Counsel has had the benefit of knowing Mr. Hamlin for the past nine months, during which he has been unfailingly warm, charismatic, and genuinely committed to change. He has reflected to Counsel that he is in a strange way grateful for this case, and sees it as God's way of creating a path for him to finally get the help he needs. That said, there have been extended periods during his incarceration at the D.C. Jail where Mr. Hamlin was clearly not being given proper medication, and was suffering ███

███████████████████████ In order to cope with his symptoms and the extraordinary violence and dehumanization of the D.C. Jail environment, he has at times requested to go into protective custody in order to better manage his symptoms. During this incarceration and in times past, he has predictably

not received any therapeutic treatment, mental health therapy, Counseling, nor meaningful substance abuse and addiction support while incarcerated at the DOC. These are supports he earnestly wishes to avail himself of, and that he desperately needs – supports he simply will not be provided in prison.

Incarceration disproportionately harms Mr. Hamlin's mental health given that he is often placed into solitary confinement or in a safe cell ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████   ████████████████ ████████████████████████████████████████

Counsel has also borne witness to the indifference of correctional officials to Mr. Hamlin's mental health struggles. ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████

### B. The Nature and Circumstances of the Offense Support Sentence of Time Served with Intensive Release Conditions to Follow

Mr. Hamlin's presence at the apartment lobby in the frigid early morning hours of February was a direct result of his homelessness, as he sought shelter from the cold and a bathroom to tend to basic needs. While in the vestibule area, surveillance footage shows Mr. Hamlin at one point taking care to defecate into a plastic bag he had with him – a sad reality faced by many unhoused individuals without consistent access to a bathroom. When he entered the lobby Rep. Craig said "good morning," an act of friendliness that prompted Mr. Hamlin to ask to use her bathroom to wash up. Rep. Craig was surely and reasonably

frightened when Mr. Hamlin came upon her suddenly. But even in the moment, she attributed Mr. Hamlin's conduct to mental illness and possible addiction, relaying to police that he "looked like he just came out of the hospital." These facts and circumstances underscore that this offense arose out of Mr. Hamlin's homelessness, and not out of some inherent potential for violence suggested by the government.

What is very clear is that Mr. Hamlin did not go into the elevator to assault Rep. Craig.  He came inside the elevator and began doing pushups on the floor. Critically, his first action ***was not*** trying to block the elevator entrance from Rep. Craig or to press the button to close the doors.  He was on the ground.  Mr. Hamlin did not immediately lunge for Rep. Craig and he said nothing to indicate he wanted to assault or restrain her. And when he got out of the elevator, he didn't pursue Rep. Craig – he ran away down the stairs.  Mr. Hamlin wanted to use the bathroom and his state of mind and state of life made him more hopeful than he reasonably should have been.

While it is of no moment to the substantive offense, it is also unclear who initiated physical contact in the elevator. Rep. Craig previously reported that she became fearful of Mr. Hamlin because of his erratic behavior and that she attempted to push past him to press the elevator buttons and leave the elevator, initiating the scuffle. While the events occurred inside a closed elevator, Ms. Craig's accounts reflect the obvious and understandable stress and confusion experienced by Rep. Craig in that moment.  Mr. Hamlin recalls that both of them became "spooked" by one another in the elevator, and that he reacted when she became confrontational towards him – a response consistent with Mr. Hamlin's paranoia and active psychotic symptoms at the time.

### (A) The D.C. Misdemeanor Offenses

Mr. Hamlin also took responsibility for his assaultive conduct during his arrest. Here too, his culpability is mitigated by the circumstances. Hours after the initial incident, when officers encountered Mr. Hamlin, he was seated peaceably on the ground outside in an area approximately half a mile from the

original incident. Mr. Hamlin identified himself and was and remained compliant.  He expressed to officers that he was mentally ill, and that he felt there were things crawling on his arms. Officers then told them they would drive him to his mother's house to get him help. *See* Exhibit 5, BWC Clip. Instead, several officers surrounded him and handcuffed him when he stood up.  It was in this context that Mr. Hamlin reacted, triggered by the police's actions while experiencing active psychotic symptoms.

Mr. Hamlin was then taken to the hospital in police custody, where he waited late into the night to be seen by medical professionals while chained to a chair. He was not permitted to use the bathroom despite repeated requests. He was denied food, water, and a blanket.  Once he was finally moved to a room, he was chained to the gurney while surrounded by police. He was then forcibly injected through his clothing with a powerful sedative and anti-psychotic, without the plan of care or his symptoms discussed with him in any way—despite telling the staff that he typically took ███████ and repeatedly requested to know what medication he was being given as staff approached and jabbed him with unknown needles, because he was allergic to certain medications. *See* Exhibit 6, BWC Clip from Hospital. It was only after he was injected through his clothing without staff even attempting to sanitize the area that staff told him they had injected him with ██████ a powerful sedative, and ███████ an antipsychotic.

The body worn camera footage is truly difficult to watch, as Mr. Hamlin is clearly suffering from mental illness and being treated in many moments as if he were an animal, not a human. The footage also shows numerous instances in which Kendrid, when he is spoken to like a human and individuals explain what is going on, is cooperative and responds in kind. For example, the footage shows a moment when a patient and kind hospital worker finally communicates with Mr. Hamlin as if he is an actual person with agency, telling him what is to happen next, leading Mr. Hamlin for the first time to respond in kind—only for another hospital worker to forcibly yank him up while he is surrounded by police officers and take him into a room where he was summarily injected with multiple injections through his clothes

without being told what it was or asked about his symptoms. In the days that followed, Mr. Hamlin was nearly catatonic and barely able to respond in court.

Mr. Hamlin has been subjected to this type of dehumanization and trauma repeatedly, a history that has caused an acute fear of police intervention and violence which led him to react against the officers in this case. Prior to their aggression, Mr. Hamlin had been compliant and peaceful. Since turning 18, Mr. Hamlin has persistently been channeled into the criminal legal system rather than being taken to, e.g. the Psychiatric Institute of Washington, or having the government request commitment to St. Elizabeth's for treatment, where there are dedicated and trained mental health professionals who could handle him with care and with longevity of treatment in mind. This trend is not unusual: jails and prisons are flooded with people whose offenses arose from untreated mental illness and substance abuse.[1] Police officers are not social workers or mental health professionals, nor should they necessarily be expected to be. However, this entire encounter underscores the need for trained mental health professionals to respond when an individual's mental health history is known as here, and the need for Mr. Hamlin to be released with a strong aftercare plan and treatment by trained professionals to address his mental illness and addiction, as offered by the Defense.

### C.    The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  The first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Mr. Hamlin accepted responsibility for his conduct without any

---

[1] *See e.g.* Dr. Wolff, Megan, "Fact Sheet: Incarceration and Mental Health," Weill Cornell Medicine Psychiatry (May 30, 2017) available at https://psychiatry.weill.cornell.edu/research-institutes/dewitt-wallace-institute-psychiatry/issues-mental-health-policy/fact-sheet-0.

benefit from the government and he did so as early as he could.  It is clear that he understands the seriousness of his offense.

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B).  While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2.  Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original).  Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety," *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21. *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.").  Mr. Hamlin's conduct was reactive and influenced both by his homelessness and his mental illness.  A harsh prison sentence in his case in particular would be ineffective.

A "just punishment" should reflect compassion towards Mr. Hamlin and circumstances largely beyond his control – mental illness, trauma ███████████████████.  His criminal history is overstated in the sense that a mere list of charges does not reflect that the circumstances of the same, of which homelessness, mental illness and resultant instability is a core cause.  It is abundantly clear that Mr. Hamlin is a man suffering from mental illness and homelessness who needs treatment, not incarceration.

### D.  The Kinds of Sentences Available to the Court

Mr. Hamlin's personal history and criminal history clearly reflect mental health issues that have not been fully addressed, and an extended time prison will do nothing to address them. Mr. Hamlin has been to prison previously, and the BOP failed then to provide proper rehabilitative support during or after his incarceration. Studies show that historically, the BOP in particular has woefully inadequate rehabilitative programming for individuals suffering from mental illness and addiction.[2] While the First Step Act has promised improvements, data is not yet available on implementation and efficacy of said programs.[3] Furthermore, it is Counsel's understanding that because of his criminal history, Mr. Hamlin will be ineligible for many types of programming that would otherwise be potentially beneficial, either due to his anticipated security level or the convictions themselves.

Research also shows that incarceration is far more dangerous and harmful to individuals suffering from documented and persistent mental illness like Mr. Hamlin.[4] As summarized by Mental Health America, "[o]ver the past 50 years [America has] gone from institutionalizing people with mental illnesses, often in subhuman conditions, [in state mental health hospitals] to incarcerating them at

---

[2]See e.g. Thompson, Christie, "Treatment Denied: The Mental Health Crisis in Federal Prisons," The Marshall Project (November 21, 2018), available at
https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons; see also "Mental Health: Policies and Practices Research Roundup," Prison Policy Institute, available at
https://www.prisonpolicy.org/research/mental_health/#:~:text=Number%20of%20people%20experiencing%20%22serious,In%20state%20prisons%3A%2074%25%20%2B.

[3] See U.S. Department of Justice, "First Step Act Annual Report" at pp. 24-25 (April 2023) available at https://www.ojp.gov/first-step-act-annual-report-april-2023.

[4] See Quant, Karen, "Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health," Prison Policy Institute, May 13, 2021 (available at
https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/).

unprecedented and appalling rates—putting recovery out of reach for millions of Americans."[56] This period of incarceration has proven to be no different. For many months at the D.C. Jail, Mr. Hamlin was being given medication that he expressed had not been and was not effective in managing his symptoms, not to mention zero access to therapeutic support or recovery. While Mr. Hamlin was finally given the medication he is accustomed to, the dose is substantially lower than is typical and he reports still experiencing severe symptoms.

Research shows that incarceration is also far more dangerous and harmful to individuals suffering from documented and persistent mental illness like Mr. Hamlin.[7] As summarized by Mental Health America, "[o]ver the past 50 years [America has] gone from institutionalizing people with mental illnesses, often in subhuman conditions, [in state mental health hospitals] to incarcerating them at unprecedented and appalling rates—putting recovery out of reach for millions of Americans."[8] Studies also repeatedly document how much more challenging the inherent violence of prison is for individuals with severe mental illness like Mr. Hamlin, particularly when they are improperly treated.

> [P]ersons with serious mental illnesses often lack the skills and abilities to cope successfully within prison. Strict conformance with prison rules can be very difficult for an individual with cognitive and behavioral limitations, and studies confirm that prisoners

---

[5] See Position Statement: Mental Health Treatment in Correctional Facilities, Mental Health America (available at https://www.mhanational.org/issues/position-statement-56-mental-health-treatment-correctional-facilities).

[6] See e.g. Bliss, Kevin, "Washington D.C. Jail's Suicide Proof 'Safe Cell' Use Not Safe for Prisoners," Prison Legal News, October 1, 2021 (available at https://www.prisonlegalnews.org/news/2021/oct/1/washington-D.C.-jails-suicide-proof-safe-cell-use-not-safe-prisoners/); see also Ryals, Mitch, "Attorneys Continue to Hear Reports of Horrific Conditions in D.C. Jail's 'Safe Cells,'" Washington City Paper, May 13, 2021 (available at https://washingtoncitypaper.com/article/516737/attorneys-continue-to-hear-reports-of-the-horrific-conditions-in-D.C.-jails-safe-cells/).

[7] See Quant, Karen, "Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health," Prison Policy Institute, May 13, 2021 (available at https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/).

[8] See Position Statement: Mental Health Treatment in Correctional Facilities, Mental Health America (available at https://www.mhanational.org/issues/position-statement-56-mental-health-treatment-correctional-facilities). [9] See also Allen J. Beck, et al., Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK; Margaret Noonan, et al., Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

with serious mental illnesses are more likely than non-disordered prisoners to accrue disciplinary violations.

E. Lea Johnston, *Criminal Law: Vulnerability And Just Desert: A Theory of Sentencing and Mental Illness*, 103 J. Crim. L. & Criminology 147, 151 (2013). Consistent with Mr. Hamlin's own experience, a 2005 study "found that 42.8% of male inmates with prior treatment for schizophrenia or bipolar disorder reported being physically assaulted by another inmate or a prison guard over a six-month period, compared to 32.4% of offenders without a mental disorder." *Id.* at 163 (citing Cynthia L. Blitz et al., *Physical Victimization in Prison: The Role of Mental Illness*, 31 Int'l J.L. & Psychiatry 385, 389 (2008)).[9] Notably, "some individuals manifest their illnesses through obstreperous behavior, hostility, aggression, and violence." *Id.* at 171.

Consistent with these reports, Mr. Hamlin struggles immeasurably when he is incarcerated. As is common with individuals experiencing schizophrenia, Mr. Hamlin experiences an increase in ████ symptoms while at the jail. ████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██ ████████ ██████████████████████████████████████████ Mr. Hamlin has also

---

[9] See also Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09*, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK; Margaret Noonan, et al., *Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables*, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

[10] *See* Bliss, Kevin, "Washington D.C.'s Suicide Proof 'Safe Cell' Not Safe for Prisoners," Prison Legal News (Oct. 1, 2021) (available at https://www.prisonlegalnews.org/news/2021/oct/1/washington-D.C.-jails-suicide-proof-safe-cell-use-not-safe-prisoners/).

[12] *See* e.g. Office of the Inspector General Report, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness," June 2017 (available at The Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness (justice.gov)); GAO Report, "Federal Prisons: Information on Inmates with Serious Mental Illness and Strategies to Reduce Recidivism," (Feb. 2018), available at GAO-18-182, FEDERAL PRISONS: Information on Inmates with Serious Mental Illness and Strategies to Reduce Recidivism.

been subject to physical violence and forcibly medicated on several occasions. In sum, his experiences at the D.C. Jail have been rife with trauma, and utterly devoid of treatment.

Given his history, for Mr. Hamlin, his detention is unduly punitive. Continuing to detain Mr. Hamlin in this case could seriously jeopardize his physical and mental wellbeing, and will do nothing to put him on the path to true rehabilitation and stability. As the complainant herself stated in one of her news interviews, he "hasn't received the help he needs to even have a chance at rehabilitation."

It is not Mr. Hamlin's fault that the federal court and U.S. Marshals do not have a contract for inpatient mental health services when the circumstances of a case may call for it, and he should not be made to suffer further trauma and harm in jail without meaningful treatment because of that systemic failure. The only "goal" achieved through a lengthy jail sentence for someone like Mr. Hamlin is temporary incapacitation, which ultimately does not, and has not, resulted in his rehabilitation or ensuring the future safety of the community. This is where a focus on how to rehabilitate Mr. Hamlin so that he can be safe and successful in the community increases in importance. The best way to do that is to permit Mr. Hamlin to engage in the long-term services and treatment that have been identified for him, while he is in safe and secure housing. Incarcerating Mr. Hamlin effectively prohibits him from receiving appropriate mental health and substance abuse support.

Importantly, Mr. Hamlin also suffers from PTSD .[12] Instead, this type of sentence will only compound Mr. Hamlin's

---

[12] *See* e.g. Office of the Inspector General Report, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness," June 2017 (available at The Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness (justice.gov)); GAO Report, "Federal Prisons: Information on Inmates with Serious Mental Illness and Strategies to Reduce Recidivism," (Feb. 2018), available at GAO-18-182, FEDERAL PRISONS: Information on Inmates with Serious Mental Illness and Strategies to Reduce Recidivism.

trauma because he will be exposed to daily violence in this environment, as he has in the past. Effectively, this means not only will Mr. Hamlin's trauma be unaddressed during a period of incarceration in the BOP, but it will likely be compounded—resulting once again in the release of a man down the road who is in even worse shape from a mental health and trauma perspective.

### E.  A Sentence Below the Guideline is Not an Unwarranted Sentencing Disparity

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Although there are no similar cases, it is worth to note that Mr. Hamlin did not know Rep. Craig was a Member of Congress. Had she not been, Mr. Hamlin would have faced a maximum sentence of 180 days. In light of this, sentencing Mr. Hamlin to one year and one day would not create a sentencing disparity.

### F.  The Purpose of Sentencing Will be Accomplished with a Sentence of 1 Year and 1 Day.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  As stated above, courts should resist anchoring a sentence to the guideline numbers. *See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's

analysis"). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve§ 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita*, 551 U.S. at 348, 350. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. **Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**

*States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

Mr. Hamlin is not a violent and hardened career criminal. Rather, his mental health history and educational struggles demonstrate that he as a man suffering from intellectual disability and mental illness who needs treatment and support not available in a carceral setting. Sadly, Mr. Hamlin has been repeatedly channeled into the criminal legal system instead of being provided proper care in the form of the meaningful mental health treatment and supportive housing that he needs – supports that would be provided in the Defense's proposed release plan.

**IV.     A Mental and Emotional Condition Departure Pursuant to U.S.S.G. § 5H1.3, or in the Alternative, a Variance, is Appropriate in This Case**

A departure or, in the alternative, a variance is appropriate in this case for mental and emotional condition pursuant to U.S.S.G. § 5H1.3. Section 5H1.3 states:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).
>
> In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. See § 5C1.1, Application Note 7.
>
> Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program (see §§ 5B1.3(d)(5) and 5D1.3(d)(5)).

18 U.S.C.S. app. § 5H1.3 (LexisNexis, Lexis Advance through Public Law 118-19, approved October 6, 2023).

Stripping away the public nature of this case down to the facts, they distill down to this: Mr. Hamlin, a man with diagnosed schizophrenia, who was not on medication and exhibiting active symptoms of psychosis, struck an unknown individual causing bruising and a small cut. At the time, Mr. Hamlin was unhoused and self-medicating with drugs while living on the D.C. streets outside in the dead of winter. When he was later approached by police quietly sitting outside on the ground, Mr. Hamlin expressed that he was experiencing active psychotic symptoms, indicating that things were crawling on his arms. It appears that some of the officers were already familiar with Mr. Hamlin as an individual known to be homeless. In order to arrest him, they misled him to believe they would be taking him to his mother's house. When they instead grabbed him to wrench his arms behind him into handcuffs, he reacted by lashing out at the officers. When they chained him to a chair and denied his basic needs and autonomy at the hospital, again he reacted by lashing out at the officers.

The guidelines contemplate departures in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed. See N. 7. The note continues:

> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the likelihood that completion of the treatment program will successfully address the treatment problem, thereby reducing the risk to the public from further crimes of the defendant, and (2) whether imposition of less imprisonment …will increase the risk to the public from further crimes of the defendant.

Mr. Hamlin's documented history, as reflected in Defense Exhibits 1 and 2, Counsels towards a departure that would permit Mr. Hamlin to be released into a significant set of conditions that the BOP and the USPO are unable to replicate. Alternatively, a variance is appropriate in light of Mr. Hamlin's documented mental health history spanning ███████████████████. Understanding the complexities of the impact of substance use on the brain makes clear that tougher penalties—like stacking sentences and lengthy periods of incarceration and probation—simply do not correlate with a deterrence effect for someone who suffers from a substance use disorder compounded with severe mental illness, like Mr. Hamlin.[13]

Through the Defense plan, Mr. Hamlin will receive intensive inpatient treatment along with six months of transitional housing.  He will have ACT Team support to help manage his medication and connect him to therapy.  Warehousing him for an additional year or two in the Bureau of Prisons will only delay the inevitable – Mr. Hamlin's release back to society with little to no support. If Mr. Hamlin were released here in the District, services can be more closely coordinated and ensured.

---

[13] *See* Prison Policy Institute, "Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health," available at https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.[14] Counsel apologizes for the late nature of this filing, and does not oppose a continuance of the sentencing should the Government or Court wish to consider these materials with the benefit of additional time.

Counsel proposes that Mr. Hamlin be admitted to ███████████ inpatient program and be brought by ███████████ staff to the 35K Mental Health Clinic for medication. ███████████ staff would also ensure Mr. Hamlin is immediately connected to a Core Service Agency through the Department of Behavioral Health, most likely MBI Health Services. *See* https://www.mbihs.com/. MBI Health Services is a certified behavioral health organization offering both medication management and a full panoply of therapeutic services and Counseling. MBI also has an ACT Team, which stands for Assertive Community Treatment. *See* https://www.mbihs.com/what-we-offer/assertive-community-treatment-%28act%29. The MBI ACT Team is dedicated to affirmatively outreaching to homeless, vulnerable patients suffering from mental illness to ensure they remain connected to mental health and critical economic supports.

Mr. Hamlin was previously connected to DBH agency, Dedicated Health Services. However, when Counsel attempted to contact Dedicated Health Services, she was unable to reach anyone and the numbers appeared disconnected. Counsel and Mr. Hamlin contacted the DBH ACCESS Helpline, where they were informed that Dedicated Health Services was shut down due to "HIPPA violations" and paying consumers to sign up for their services. While Mr. Hamlin is eligible for services at MBI, the receptionist at MBI previously indicated that he would have to physically come to their location to conduct at intake upon his release from the jail to be officially connected to their services. ███████████ staff are willing and available to escort Mr. Hamlin to do so upon release, and to continue coordinating care while he is in residential inpatient treatment.

To Counsel's knowledge, Mr. Hamlin has never before received ACT Team services, nor inpatient addiction treatment with continuing residential treatment after the initial 28 or 45 day blackout period of treatment, much less a combination of the same. It goes without saying that this combination of services

is far more robust than anything the jail could provide, promoting Mr. Hamlin's rehabilitation and protecting the community by reducing the risk of recidivism.

Mr. Hamlin's mental health condition is one that is responsive to medication, and addiction treatment in a focused, supportive environment can help ensure he remains compliant with any psychiatric plan of care. Furthermore, evaluators have consistently recommended individual and family therapy so he can heal from his history of trauma and learn coping skills in a focused, trusting environment. These services should be priorities to prevent recurrences of the conduct that brought him before the Court in this case.

To the contrary, the government's request that Mr. Hamlin serve the maximum guideline sentence of 39 months, with each sentence to run consecutively, will have the practical effect of compounding Mr. Hamlin's mental health issues and trauma in prison where there will not be adequate support, and then releasing him into the community after that sentence with no meaningful mental health services, addiction treatment or housing. Such a resolution not only fails to rehabilitate and actively harms Mr. Hamlin, but also undermines the government's stated goals of achieving greater community safety. The effect of this resolution will result in the release of a man back into the community who is in worse, or at best, the same, shape than when he went in – something we are hard-pressed to believe the Government or the Complainant desires.

For the foregoing reasons, Mr. Hamlin respectfully requests that this Court sentence him to time served, place him on supervised release and release him to inpatient treatment as noted below with the following additional conditions, which will provide a pathway to long-term stability, housing, and wraparound mental health and supportive services for Mr. Hamlin:[14]

---

[14] Counsel apologizes for the late nature of this filing, and does not oppose a continuance of the sentencing should the Government or Court wish to consider these materials with the benefit of additional time.

- Placement at ███████████ Inpatient Treatment Program with 6 month Transitional Housing Program to follow;

- GPS monitoring with Home Incarceration while in treatment;

- Immediate connection to MBI's ACT Team, a D.C. Office of Behavioral Health Core Service Agency for ongoing psychiatric care while in inpatient treatment, as well as assistance in applying for economic supports such as SSDI;

- Referral to the Department of Disability Services for one on one aide services and future supportive housing;

- Referral for housing voucher for long-term housing post-treatment;

- Reporting on a "regular basis" to Pretrial Services Agency or some other agency, *id*. § 3142(c)(1)(B)(vi);

- Refrain from "any use of a narcotic drug or other controlled substance . . . without a prescription," *id*. § 3142(c)(1)(B)(ix).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Kathryn D'Adamo Guevara
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

# Exhibit List

**Ex.1:**      Dr. Robinson Report

**Ex. 2:**     Rep. Craig Statement to USAO

**Ex. 3:**     Letter of Harriet Hamlin, Mr. Hamlin's Mother

**Ex. 4:**     Dr. Boyd Report

**Ex. 5:**     BWC Clip of Police Arrest

**Ex. 6:**     BWC Clip of Forcible Injection

# Exhibit 1:

## Dr. Robinson Report

UNDER SEAL

# Exhibit 2:

Rep. Craig Statement to USAO

On 02/16/2023 at 1615 hrs, the USAO-DC and USCP conducted a case update conference call with Rep. Craig. During the call the Congresswoman provided the following information:

Assault description:
Subject was observed pacing back and forth at the bathroom. Congresswoman entered the elevator and swiped her building access FOB and selected the 8th floor. Subject "snuck" into the elevator so the Congresswoman pushed the button to reason with subject who began to do pushups and jumped up in her face stating we are going to your apartment to use the bathroom. Congresswoman stated "no get out of my elevator now". The subject became agitated. Subject pushed past the Congresswoman causing her finger to release the button and the doors closed. The congresswoman pushed the subject to gain access to the elevator buttons but the subject got behind her putting his hands on her shoulders near her neck impeding her from getting out or manipulation the elevator buttons. When reaching the 8th floor the subject continued to impede the Congresswoman from exiting the elevator. When asked if the subject retrained the Congresswoman's movement she stated "Absolutely". The Congresswoman threw her coffee over her shoulder at the subject who released her and punched her in the face. The Congresswoman fell out of the elevator and yelled for help.

# Exhibit 3:

Letter of ███████████ Mr. Hamlin's Mother

To Whom It May concern,

My name is ████████████, and I am writing to provide insight into the totality of Kendrid Khalil Hamlin. Kendrid is the youngest of five siblings: two brothers and two sisters. He grew up with his two brothers, one of his sisters, and both parents until his father and I divorced when he was around eight or nine years old.

It has been our hopes as parents, to provide a better life for all our children than the lives we had growing up. Kendrid was a happy, enthusiastic child who would get into minor mischief as a toddler and enjoyed rough housing with his older brothers. I noticed a change in Kendrid around 3 years old, after my mother passed. My mother was the person who would often care for Kendrid while his father and I worked.



Sadly, after this traumatic experience, Kendrid began to fall into homelessness and substance abuse. He would repeatedly find himself in legal trouble for minor infractions because treatment and resources were not available or accessible for his mental health or substance abuse disorder. While in jail DC in Washington, D.C., he was constantly tortured and abused so much that he feared any aspect of the correctional system. Kendrid had reached a point where he sought sanctuary in sleeping on the cold hard streets, self-medicating and fending for himself amongst those of a similar predicament instead of entrusting his well-being in a system that has failed him time and time again. He is truly afraid and does not know where to turn for quality, reliable help.

My family and I have tried being advocates for his mental health struggle by pleading to for him to be committed for nothing more than HIS OWN safety but have been told for over a decade that unless he is harming himself or others there is nothing we can do. Even in times where he has been a danger to himself, he was just handcuffed and villainized.

Kendrid has a drug addiction because the Juvenile Justice System put in place to help him as a child, violated his trust and stripped him of his innocence. They gave him substances that have created a problem that he cannot muster up the strength the combat on his own. From that point in adolescence, he would find himself behind bars in the D.C. jail system. But, instead of correcting the problem as a correctional facility should, his traumas were exacerbated. He was thrown naked in a cell, tortured, abused, and pushed to the point of contemplating suicide. He even had to learn of his oldest brother's death while behind bars. Now, he is irreparably stricken with a debilitating fear at the sight of a police officer.

I am asking as a mother and as a citizen that Kendrid gets REAL help. Kendrid needs substance abuse and mental health treatment. No human should just be locked away before they are provided with the proper tools to lead a healthy and productive life.

Congresswoman Craig stated in her interviews that mental health, drug addiction and homelessness are the very things for which she advocates and write policies. I beg of her, my family begs of her, to not throw Kendrid in another jail cell where he won't get the services he so desperately needs. His substance abuse disorder has tormented him long enough. Now is the time to take appropriate action and make the change that society needs. Kendrid needs a long-term drug treatment program where he can benefit from mental health services, so eventually he can become a productive member of society. He tells us all the time he has dreams of continuing his education and possibly even running a business of his own.

Kendrid is so much more than a homeless, drug addict that gets into trouble. He has been unfairly characterized because the media doesn't know he is a loving Son, Brother, and Uncle whose family loves him deeply. He is compassionate and caring in the midst of his homelessness. He gets up in the mornings to care for the homeless. He goes to the food pantries and gets food and toiletries for

those who can't fend for themselves. When he is not under the influence of any substances, he has dreams of opening a homeless shelter and providing services to those living on the fringes who continue to fight a battle similar to his. It is because of Kendrid that I started a nonprofit to help others in the same situation because I can't help my son who I love dearly. My family and I host charity events, where we feed the homeless community on Kendrid's behalf.

I celebrated Kendrid's birthday at the shelter, on 2nd and D Street Northwest, by bring him and the community food. Kendrid, being the caring person that he is, helped his siblings and I pass out food and he did not even attempt to grab food for himself until all those around him were properly cared for first. Afterwards, he turned to me and said, "Ma that made me feel good." Kendrid is human. He has been dehumanized, tortured, and abused by the justice system. I ask as a mother, who has been searching, begging and pleading to get her baby boy help, that the courts find mercy and provide Kendrid with the help he so desperately for his addiction and mental health disorder, so he can begin to live the life that he's dreamt of for so long.

# Exhibit 4:

Dr. Boyd Report

UNDER SEAL